**In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.**

**Bankruptcy No. 85–01307–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

July 26, 1988.

———

William R. Cogar, Guys, Valentine, Davenport & Moore, Richmond, Va., Murray Drabkin, Cadwalader, Wickersham & Taft, Washington, D.C., for Dalkon Shield Claimants Committee, in its own right and on behalf of A.H. Robins Co., Inc.

John Waites, U.S. Trustee, Alexandria, Va.

S. David Schiller, Asst. U.S. Atty., Richmond, Va.

Mark Budnitz, S.E.C., Atlanta, Ga.

Michael L. Cook, Skadden, Arps, Slate, Meagher & Flom, New York City.

Robert M. Miller, David A. Strumwasser, Berlack, Israels & Liberman, New York City.

Harold S. Novikoff, Wachtell, Lipton, Rosen & Katz, New York City.

H. Sean Mathis, Jesup & Lamont Capital Corp., New York City.

Joseph S. Friedberg, Minneapolis, Minn., Theodore I. Brenner, Steven W. Bricker, Brenner, Baber & Janus, Richmond, Va., for Breland, et al.

Ross C. Reeves, Willcox & Savage, P.C., Norfolk, Va.

W. Scott Street, III, Williams, Mullen & Christian, Richmond, Va., for Aetna Cas. & Sur. Co.

M. Caldwell Butler, Woods, Rogers & Hazlegrove, Roanoke, Va.

George B. Little, Lawrence B. Cann, Little, Parsley & Cluverius, Richmond, Va.

Stanley K. Joynes, III, Rilee, Cantor, Arkema & Edmonds, Richmond, Va., for Future Tort Claimants.

Ralph R. Mabey, LeBoeuf, Lamb, Leiby & MacRae, Salt Lake City, Utah.

Peter A. Ivanick, LeBoeuf, Lamb, Leiby & MacRae, New York City.

Francis E. McGovern, Birmingham, Ala.

Michael A. Cooper, Sullivan & Cromwell, New York City.

Clifford Shoemaker, Vienna, Va.

Robert E. Manchester, Manchester & O'Neill, Burlington, Vt., John Cole Gayle, Jr., Richmond, Va., for Rawe claimants and Carolyn Abernethy, et al.

J. Hunt Brasfield, Alexandria, Va., Michael L. Goldberg, Washington, D.C., for Marcia Rubinroit, et al.

---

K. Daniel Heininger, Coudert Brothers, Washington, D.C.

Joseph F. McDowell, III, Cullity, Kelley & McDowell, Manchester, N.H.

Paul H. Silverman, Garrity, Connolly, Lewis, Lowry, Grimes & Silverman, New York City.

John T. Baker, Denver, Colo., J. Stephen Proffitt, III, Richmond, Va., Bradley Post, Wichita, Kan., for Pamela Reiter, et al.

Neal Batson, John C. Weitnauer, Atlanta, Ga.

George James Mallios, Mallios & Doyle, Austin, Tex.

## MEMORANDUM IN RE CONFIRMATION ORDER

MERHIGE, District Judge, and BLACKWELL N. SHELLEY, Bankruptcy Judge.

On August 21, 1985, A.H. Robins Company, Incorporated ("Robins") filed its petition for reorganization relief pursuant to 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). On that same day, this Court, upon representation that the major aspect of the case required the services of an Article III judge, withdrew the reference of this case to the Bankruptcy Court excepting for limited matters, thus retaining original jurisdiction in the District Court. *See Northern Pipeline Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

By agreement, the undersigned, with few exceptions, conducted all proceedings jointly.

During this entire case, despite objections by interested parties, Robins was, pursuant to 11 U.S.C. §§ 1107 and 1108, permitted to and did manage its affairs as debtor-in-possession with monitoring by a court-appointed Examiner.

A full appreciation of the circumstances leading to the Court's instant consideration of the feasibility of the Debtor's "Sixth Amended and Restated Plan of Reorganization" in support of its motion for confirmation necessitates a condensed recitation of the events leading both to the petition of August 21, 1985 and to the matter now under consideration.

*Background*

In June 1970, Robins, a pharmaceutical enterprise, engaged in the research, development, manufacturing, and marketing of prescription drugs and health care products on its own behalf through subsidiaries located both in the United States and in over 100 foreign countries, purchased from the Dalkon Corporation an intrauterine birth control device marketed as a Dalkon Shield.

The very essence of Robins' business operations involves major and consistent interaction with doctors, hospitals and other health care providers. The goodwill of individuals and organizations in the profession and business of health care is a major factor in the financial viability of the Debtor.

Robins and its subsidiaries distributed almost five (5) million Dalkon Shields throughout the United States and foreign countries until June, 1974 when the product was withdrawn from the United States market, and early 1975 when foreign sales were discontinued.

By the mid–1970's, numerous lawsuits alleging injuries associated with the use of the Dalkon Shield were filed against Robins, its officers, directors, employees, as well as its insurer, Aetna Casualty and Surety Company ("Aetna") and various other co-defendants, including hospitals and physicians.

By the time of filing of the instant proceedings, Robins was faced with almost 6,000 lawsuits and claims arising from the Dalkon Shield, and had by that period of time, along with Aetna, paid approximately $530 million in settlements or in satisfying judgments arising from Dalkon Shield claims.

Additionally, in 1977, Robins and its directors and officers, including William L. Zimmer, III, E. Claiborne Robins and E. Claiborne Robins, Jr., became the subject of a class action suit in 1977 by stockholders Kalman and Anita Ross, based on the alleged dissemination of false and mislead-

ing information, and failure to disclose other information, concerning the Dalkon Shield to purchasers of Robins' stock during the period of March 8, 1971 through June 28, 1974 (the "Ross Class Action"). The parties to the Ross Class Action agreed upon a settlement in 1984 pursuant to which Robins deposited $6.9 million with its attorneys under an escrow agreement (the "Escrowed Funds") and submitted the settlement in that amount to the Class Action Court. The Class Action Court had not ruled on the proposed settlement when Robins commenced its reorganization case on August 21, 1985.

In accord with the Ross Order, this Court authorized named plaintiffs Kalman and Anita Ross to vote as class representatives either acceptance or rejection of the Plan on behalf of the Ross Class Action plaintiffs.

Under the Plan, and to resolve a controversy regarding whether the Escrowed Funds are property of the estate, the claim of the plaintiffs in the Ross Class Action is limited to the Escrowed Funds.

As the Court has indicated, Aetna had been Robins' insurer covering compensatory damages arising from the use of the Dalkon Shield prior to March, 1979.

Robins and Aetna differed as to the extent of the coverage to be afforded Robins under its policy with Aetna, and in 1979 Robins brought suit against Aetna in reference to Aetna's coverage of Dalkon Shield alleged claims (the "Coverage Litigation"). Thereafter, Robins and Aetna entered into a settlement agreement wherein it was agreed that (a) Robins receive $70 million in additional insurance coverage, (b) Aetna would continue to handle and defend Dalkon Shield cases and claims on Robins' behalf and (c) certain releases were exchanged.

Aetna has filed in these proceedings a proof of claim seeking from the Debtor reimbursement of approximately $58 million and asserting as well, rights of contribution. Robins, in turn, has contended that it has available to it insurance coverage from Aetna in excess of Aetna's proof of claim.

The Court directed its Examiner to investigate the amount of insurance coverage available to Robins, including Aetna's, and to report on the propriety of the settlement between Aetna and Robins in the Coverage Litigation. After a lengthy investigation, the Examiner, Ralph Mabey, a former Bankruptcy Judge, concluded that the settlement of the Coverage Litigation was an arms-length, good faith resolution of the issues involved, and that the amount of the settlement was reasonable as a resolution of the disputed claims.

As the Court has indicated, the consequences of Robins' Dalkon Shield venture were devastating both from a financial aspect as well as from the physical suffering alleged to have resulted to hundreds of thousands of claimants, some of whom have established their claimed injuries as evidenced by a number of judgments rendered against Robins amounting to millions of dollars.

The evidence before the Court is that, immediately prior to the reorganization filing, the financial drain upon Robins' assets, coupled with declining employee morale and productivity, as well as Robins' inability to borrow money at a time of a serious cash flow deficiency, led to a late determination to seek protection under the Bankruptcy Code.

Promptly following the filing for reorganization, the Court authorized and approved the appointment of a number of official committees. Each of the committees, with court approval, retained counsel as well as other experts.

The official committees, Equity Security Holders' Committee, the Unsecured Creditors' Committee, the Dalkon Shield Claimants' Committee, a Future Claimants' Representative (collectively, the "Official Committees"), the U.S. Trustee, the United States Attorney, as well as other interested parties each contributed their views, with few exceptions, on literally every issue which arose during these proceedings.

Because the distribution of the Dalkon Shield to its ultimate users was not made by Robins, hence to a great extent claim-

ants were unknown to Robins, a method of notice of the proceedings had to be devised which would conform to the requirements of due process.

On November 21, 1985, the Court entered an order (the "Bar Date order") establishing April 30, 1986 as the deadline for filing claims against Robins (the "Bar Date"). The claim filing process required those persons wishing to assert a Dalkon Shield claim to file initially, on or before the Bar Date, only a post card containing their name, address and intention to assert a claim ("post card claims"). The Bar Date order established the form of notice to be distributed to Dalkon Shield claimants, trade creditors and stockholders and authorized Robins to undertake an international campaign for notifying all unknown claimants of the Bar Date and informing them of the procedures for filing a claim. The Bar Date order further provided that questionnaires would be sent to all persons or entities asserting Dalkon Shield claims against Robins in order to obtain necessary additional information relating to such claims.

Pursuant to the Court's order, Robins embarked on a massive international campaign for notifying all potential creditors and claimants not only of the Bar Date, but informing them of the uncomplicated method for filing a claim.

Persons who had used the Dalkon Shield but had not yet manifested an injury were encouraged to take the necessary step to assert a claim even though not yet manifested. The Court's method of notification subsequently met with approval by the United States Court of Appeals for the Fourth Circuit. *See Vancouver Women's Health Collective Society v. A.H. Robins Co.*, 820 F.2d 1359 (4th Cir.1987).

Pursuant to the Bar Date order, the Clerk of the Bankruptcy Court sent to each person who filed a timely post card claim a two-page questionnaire (the "Court Questionnaire") designed to elicit basic claim information from each potential Dalkon Shield claimant. The Court established June 30, 1986 as the deadline for domestic claimants, and July 30, 1986 as the deadline

for foreign claimants, to return the Court Questionnaire. The District Court later extended the Questionnaire response deadline for claimants residing in Taiwan to October 6, 1986.

In excess of 175,000 Dalkon Shield claimants timely returned the Court Questionnaire.

By order entered May 5, 1987, the Court directed Robins to mail a supplemental notice and second questionnaire (the "Second Questionnaire") to each of those Dalkon Shield claimants who had not returned the first Court Questionnaire. This supplemental notice required that the Second Questionnaire be returned to the Clerk of the Bankruptcy Court no later than July 15, 1987 for domestic Dalkon Shield claimants, and August 12, 1987 for foreign Dalkon Shield claimants, and stated that failure to do so would bar the Dalkon Shield claimant from pursuing a claim. Approximately 21,000 Dalkon Shield claimants timely returned the Second Questionnaire.

By order entered July 10, 1987, the Court disallowed Dalkon Shield claims of domestic Dalkon Shield claimants who did not timely return the Court Questionnaire or the Second Questionnaire. The July 10, 1987 order provided, however, that the Court would entertain written requests for reconsideration of the order of disallowance if such requests were filed with the Bankruptcy Court on or before September 11, 1987. The Court has conducted hearings on such written requests.

A number of efforts were made primarily by the Claimants Committee seeking an order, pursuant to 11 U.S.C. § 1104 (1987), for the appointment of a Trustee to manage the A.H. Robins Company. After a full hearing, the Committee's motion was denied. The Court, though finding civil contempt, held that appointment of a Trustee was neither necessary nor desirable. As the United States Court of Appeals noted in this context, "a policy of flexibility pervades the bankruptcy code with the ultimate aim of protecting creditors." *Committee of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 242 (4th Cir.1987).

It should be noted, as well, that the Court's Examiner had diligently monitored the business activity of the Debtor. The Court was aware that, being the beneficiary of the stay imposed by 11 U.S.C. §§ 362(a)(1) and 362(a)(3) as well as that imposed by the Court pursuant to 11 U.S.C. § 105 and 28 U.S.C. § 1334, *see Oberg v. Aetna Casualty & Surety Co.*, 828 F.2d 1023 (4th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988), the Debtor had once again become, at least under the umbrella of the stay, financially viable.

To have, in the absence of fraud or mismanagement, replaced the existing management with a Trustee would have been to expose thousands of potential claimants to danger of a financial disaster.

The Court was even then aware that the nature of the existing claims was such as to reasonably preclude payment by Robins, out of its profits, of sums sufficient to satisfy the outstanding claims in any reasonably foreseeable future.

The Court concluded, after many conferences (in excess of 225) on a myriad of issues, and formal argument by the parties, as well as having considered its Examiner's views, that only an estimation of the personal injury claims en masse would bring forth additional prospective purchasers or those interested in merging with Robins. The Court was of the view that any such party would not be willing to accept less than a cap on the value of the claims.

Interestingly, the Court's view in this regard appears to have been fortuitous for evidence recently presented establishes that the Debtor, under protection of the stay, had its greatest financial year in 1986 when its profits *before taxes* were approximately $172 million. As the Court will elaborate infra, the amount to be received under the Plan, which the Court finds fair and feasible, represents a figure which could not be recovered from Robins, from its profits, in decades, assuming, as the evidence shows cannot reasonably be assumed, Robins could remain economically viable. Indeed, under the present Plan, the sums available to Dalkon Shield claimants represent a figure in excess of the Company's liquidation value.

The Court concluded an estimation was appropriate—an action which Robins had been advocating since February 1986 and which the Equity Security Holders Committee had moved for on May 18, 1987.

Reasonably early on in the proceedings, the Court had appointed Professor Francis E. McGovern as the Court's expert to develop in cooperation with the Dalkon Shield Claimants' Committee, the Unsecured Creditors' Committee, the Future Claimants' Representative, the Equity Security Holders' Committee, Robins and Aetna, a reliable data base to aid in analyzing and determining the aggregate value of Dalkon Shield claims. Each of the foregoing parties, including Professor McGovern, retained experts to assist it in the collection, evaluation and analysis of data regarding Dalkon Shield claims (the "Data Collection Process").

The Data Collection Process, which lasted over a year and a half, resulted in the compilation of an extensive data base which was made available to Robins, the Official Committees, Aetna, and their respective experts for their use in connection with the estimation motions.

The Estimation Hearing on the motions of Robins and the Equity Security Holders' Committee (the "Estimation Motions") was set for November 5, 1987, and notice of the Estimation Hearing and the matters to be considered at it was sent by the Clerk of the Court to all parties in interest.

The parties each conducted extensive discovery in preparation for the Estimation Hearing.

On November 5, 1987, the Estimation Hearing commenced and concluded on November 11. At the hearing, the parties in interest presented their estimates and were heard regarding the aggregate amount of Robins' Dalkon Shield liability and the propriety of a one claim/one vote procedure for voting purposes to determine whether a class or classes of Dalkon Shield claims had or had not accepted a plan. The Court heard extensive medical, statistical, epide-

miological, and other expert testimony. Numerous briefs, memoranda and expert reports were submitted to the Court. Parties in interest requesting to be heard were heard.

The estimates of Robins, Aetna and the Official Committees were as follows:

Robins—$800 million to $1.3 billion

Equity Security Holders' Committee—$1.03 billion

Unsecured Creditors Committee—$1.54 billion

Dalkon Shield Claimants' Committee—$4.2 billion to $7.0 billion

Aetna—$2.2 billion to $2.5 billion

In addition, the expert retained by the Future Claimants' Representative, estimated the value of so-called "future claims" to be approximately $660 million over a fourteen year period.

During the course of the Estimation Hearing, the Court requested experts for various parties in interest to recalculate their estimates using various assumptions, different from those used by those experts in their original analyses.

The Court, having reviewed the testimony, arguments, expert reports, memoranda and briefs, and having observed the witnesses and considered the weight to be given to their respective testimony as developed by both direct and cross examination as well as the assumptions, methodology and reasoning employed by the parties in reaching their estimates and various legal theories for reinstatement of untimely filed claims, announced and now reconfirms its finding that the sum of $2.475 billion, payable over a reasonable period of time, is sufficient to pay in full all Dalkon Shield personal injury claims as well as expenses of the Trusts established to administer the claims (the "Estimate").

The viable claims now pending are in excess of 195,000. Any attempt to evaluate each individual claim for purposes of voting on the Debtor's Plan of Reorganization would, as a practical matter, be an act of futility, and would be so time consuming as to impose on many, many deserving claimants further intolerable delay all not only to their detriment, but to the detriment of the financial well being of the estate as well.

The Court is intellectually and morally satisfied that the placing of a nominal value on each claim for voting purposes was appropriate, and the Court so ordered under date of March 21, 1988. *Cf. Kane v. Johns–Manville Corp.*, 843 F.2d 636, 651 (2d Cir.1988) (Miner, J., concurring) (delay entailed by estimation of individual claims for voting purposes would be fatal to plan and to recovery for claimants).

No offer approximating the Court's estimated $2.475 billion had been forthcoming until the Court's public announcement of its view. Within a matter of days, at least two offers were forthcoming.

By far, the offer by American Home Products Corporation (AHP), made in December 1987, was the highest and promised the quickest pay out to the claimants. AHP proposed a merger of Robins with its newly-acquired subsidiary, AHP Subsidiary (9) Corporation, premised upon (i) full payment of Dalkon Shield claimants in accordance with the Estimate, and (ii) the belief that AHP, AHP Subsidiary (9) Corporation, Robins, the Successor Corporation and their personnel would be freed from any involvement in litigation or claims regarding the Dalkon Shield. The Court deems AHP's concern in this regard to be well taken. An investment of the magnitude involved here requires all reasonable effort to, consistent with the law, end all Dalkon Shield litigation, including the class action against Aetna (*"Breland* matter").[1]

---

**1.** Seven Dalkon Shield claimants filed a complaint against Aetna in which they sought certification of a broad class of Dalkon Shield claimants. *Glenda Breland v. Aetna Casualty and Surety Company,* Civil Action No. 86–0315–R. The class was certified and the parties negotiated a settlement. An evidentiary hearing was held on the reasonableness, adequacy and fair-

ness of the proposed settlement. The Court subsequently studied the affidavits and exhibits submitted and determines that the proposed settlement is reasonable, adequate, fair and in the best interests of *Breland* plaintiffs. An order and a memorandum will issue shortly.

In connection with the "Qualified *Breland* Settlement" and the Plan, Robins and Aetna will mutually release each other from claims relating to the Aetna insurance, Aetna's Proof of Claim will be disallowed, and Aetna will provide monies and insurance policies pursuant to the terms of a Qualified Breland Settlement, all of which, in the Court's view, will add to the sums available to Dalkon Shield claimants.

The compensation available for Dalkon Shield claims pursuant to the Plan and the merger with AHP Subsidiary (9) Corporation exceeds the Estimate as well as the liquidation value of the Debtor.

AHP is primarily engaged in the health care, pharmaceutical and consumer product business. For the year 1987, AHP had sales in excess of $5 billion and net income in excess of $845 million. In the first quarter of 1988, AHP had in excess of $1 billion in available cash or cash equivalents. AHP has in place a $2 billion line of credit with a group of major money center banks which will be available to meet funding obligations under the Plan. At the end of the first quarter of 1988, Robins had approximately $375 million in available cash. After notice and hearing, and authorization by the District Court, Robins, AHP, and AHP Subsidiary (9) Corporation executed and delivered the merger agreement annexed to the Plan as of March 21, 1988.

*The Plan*

Robins filed its Fifth Amended and Restated Plan of Reorganization and its Fifth Amended and Restated Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (the "Fifth Amended Disclosure Statement") on February 11, 1988.

Robins gave in excess of 30 days written notice of the March 21, 1988 date for the hearing on the adequacy of the Fifth Amended Disclosure Statement to all parties entitled to receive notice pursuant to Bankruptcy Rule 3017(a) and the orders of this Court.

In response to certain objections filed to the Fifth Amended Disclosure Statement,

and pursuant to negotiations among the major parties-in-interest in Robins' reorganization case, Robins agreed to modify the Fifth Amended Disclosure Statement.

Robins filed its Sixth Amended and Restated Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure Statement"), incorporating those modifications, on March 28, 1988. Robins filed its Sixth Amended and Restated Plan of Reorganization (the "Plan") on the same date.

After notice and a hearing on March 21, 1988, the District Court approved the Disclosure Statement as containing adequate information as defined in Section 1125 of the Bankruptcy Code by order dated April 1, 1988 *(nunc pro tunc)* (the "Disclosure Statement Order").

On or before April 25, 1988, Robins transmitted copies of (a) the Disclosure Statement (including the Plan as an exhibit thereto), (b) the "Notice of Hearing on (i) Confirmation of Debtor's Plan of Reorganization, (ii) Debtor's Request for Disallowance of Punitive Damages, and (iii) other matters set forth in Section 7.02(a) of Debtor's Plan of Reorganization" (the "Notice of Confirmation Hearing"), (c) the Disclosure Statement order (without Exhibit A), (d) the Court's March 21, 1988 "Order Temporarily Allowing and Estimating Dalkon Shield Claims for Voting Purposes Only" (the "Voting Order"), (e) letters from the United States District Court, the Official Committee of Dalkon Shield Claimants, Robins, the Official Unsecured Creditors' Committee, and counsel to the Official Committee of Equity Security Holders (the "Letters"), and (f) ballots for the purpose of voting to accept or reject the Plan ("Ballots") to all Dalkon Shield Claimants, creditors and equity security holders as provided in the Disclosure Statement Order and the Court's April 18, 1988 "Order Under Bankruptcy Rule 3018 Authorizing Class Representatives to Accept or Reject Plan

A "Qualified *Breland* Settlement" is a condition precedent to the Debtor's Plan of Reorganization.

on Behalf of Class Action Plaintiffs" (the "Ross Order").

Robins filed and transmitted to holders of untimely filed Class 3A Dalkon Shield claims an "Objection and Notice of Hearing on Objection of A.H. Robins Company, Incorporated, Debtor and Debtor–in–Possession, Under 11 U.S.C. § 502(a) and Bankruptcy Rules 3003(c)(2) and 3007 to Certain Untimely Dalkon Shield Claims" (the "Late Claim Objection"), seeking an order disallowing certain untimely filed Class 3A Dalkon Shield Claims and providing that holders of such claims are barred from voting such claims on the Plan.

Robins filed and transmitted to holders of timely filed and untimely filed Class 3A and 3B Dalkon Shield claims an "Objection and Notice of Hearing on Objection of A.H. Robins Company, Incorporated, Debtor and Debtor–in–Possession, Under U.S.C. § 502(a) and Bankruptcy Rule 3007 to Dalkon Shield Claims" (the "Punitive Damage and General Objection"), seeking an order providing that any portion of any unliquidated Dalkon Shield claim that is or may be for punitive or similar damages is disallowed and that no Dalkon Shield claim is allowed except and to the extent provided for in the Plan and the Voting Order. Robins served the Punitive Damage and General Objection on holders of timely filed Class 3A and 3B Dalkon Shield claims along with the Disclosure Statement and related materials described in paragraph 7 above on or before April 25, 1988.

The Notice of Confirmation hearing was transmitted to *Breland* Class B members in connection with the mailing done by the *Breland* plaintiffs, as described in the report filed with the Court on July 6, 1988.

Robins gave supplemental publication notice of the confirmation hearing and matters to be considered at it in accordance with this Court's order of April 29, 1988 as modified by order dated May 18, 1988 (the "Publication Notice Order").

On or before June 16, 1988, Robins transmitted the Notice of Confirmation Hearing and the Disclosure Statement to various persons who are parties to unexpired leases or executory contracts with Robins.

Robins transmitted copies of the "Notice of the Date On or Before Which Each Person Retained or That May Request Compensation and/or Reimbursement of Expenses in This Case Pursuant to Sections 327, 328, 330, 503(b) or 1103 of The Bankruptcy Code Must File a Binding Estimate of the Maximum Amount of Allowance of Compensation and Reimbursement of Expenses to be Requested in This Case" (the "Fee Cap Notice") to various persons retained, or that might seek compensation or reimbursement of expenses from the Debtor's estate pursuant to Sections 327, 328, 330, 503(b) or 1103 of the Code (the "Noticed Professionals") pursuant to the Court's June 13, 1988 "Order Establishing and Approving Form and Method of Notice of The Date On or Before Which Each Person Retained or That May Request Compensation and/or Reimbursement of Expenses in This Case Pursuant to Sections 327, 328, 330, 503(b) or 1103 of The Bankruptcy Code must File a Binding Estimate of The Maximum Amount of Allowance of Compensation and Reimbursement of Expenses To be Requested in This Case" (the "Fee Cap Order").

Ballots for the acceptance or rejection of the Plan were not solicited prior to entry of the Disclosure Statement Order or after July 11, 1988.

Certification of the results of the balloting by The Corporation Trust Company ("CT") and Robins were filed with this Court on July 18, 1988.

Various objections to confirmation of the Plan (raising, among other things, challenges to the jurisdiction of this Court to grant the relief provided for in the Plan and the order confirming the Plan, the releases and injunctions provided for in the Plan, the disallowance of punitive damages, and the treatment of Dalkon Shield claims and equity interests under the Plan) were filed, litigated and considered by this Court.

A number of objections were filed on behalf of claimants who actually voted in favor of the proposed Plan or who did not vote. While Robins objected to the stand-

ing of these objections, the Court, nevertheless, gave them full consideration.

After the conclusion of voting on the Plan, Robins filed certain technical modifications to the Plan on July 15, 1988 and served a "Motion Pursuant to Bankruptcy Rule 3019 for an Order Finding that the Sixth Amended and Restated Plan of Reorganization purposed by A.H. Robins Company, Incorporated, Debtor and Debtor–in–Possession, As Technically Modified, Does Not Adversely Affect Treatment of Claims or Interests") (the "Technical Modification Motion"), on July 15, 1988. The modifications to the Claimants Trust, the Claims Resolution Facility and Sections 4.03, 5.01 and 6.07 of the Plan set forth in the Technical Modification Motion (a) permit the creation of the Claimants Trust before the Consummation Date so that the "start-up" payment contemplated by Section 6.07 of the Plan can be made and administered and (b) contain other technical corrections. There have been no modifications which adversely affect the treatment of claims or interests under the Plan. The Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interest be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

The Plan, incorporating the merger agreement with AHP and AHP Subsidiary (9) Corporation, is the first consensual agreement in this case for the treatment of all claims and interests. The Plan is truly the considered result of long and dedicated negotiations between Robins, AHP, and the official committees. Assisting as well was the Court's Examiner and when called upon, the Court.

The Plan has been accepted overwhelmingly in writing by the creditors and security holders whose acceptance is required by law in accordance with the special voting procedures approved by this Court's Ross Order and Voting Order. Over 140,000 votes, approximately 72% of the total class, were cast in regard to Class 3A claims (Dalkon Shield Personal Injury Claims). Ballots accepting the Plan were timely received from 94.38% of all Dalkon Shield claimants who voted, representing more than two-thirds in number and amount of that class.

With respect to Class 3B claims (Dalkon Shield Other Claims), ballots accepting the Plan were timely received from 97.91% of all Dalkon Shield claimants actually voting in such class, representing more than two-thirds in number and amount of that class.

With respect to Class 8 Claims (Financial Institution Claims), ballots accepting the Plan were timely received from holders of at least two-thirds in amount and more than one-half in number of creditors actually voting in such class.

With respect to Class 9 Claims (Securities Claims), a ballot accepting the Plan was timely received from the official class representative of the plaintiff class in the Ross Case, such ballot representing one-hundred percent in amount and number of creditors in such class pursuant to the Ross Order.

With respect to Class 10 Interests (Common Stock Interests), ballots accepting the Plan were timely received from holders of at least two-thirds in amount of equity security interests actually voting in such class.

With respect to Class 11 Interests (Common Stock Option Interests), ballots accepting the Plan were timely received from holders of at least two-thirds in amount of equity security interests actually voting in such class.

With respect to all other classes, they are not impaired.

The Plan complies with the applicable provisions of the Code.

Robins solicited acceptances of the Plan in good faith.

The identity, qualifications, and affiliations of the persons who are to be directors or officers, or voting trustees, if any, of Robins or of the Successor Corporation after confirmation of the Plan have been fully disclosed, to the extent known, and the appointment of such persons to such offices, or their continuance therein, is consistent with the interests of Robins'

creditors and equity security holders and with public policy.

The identity of any insider that will be employed or retained by Robins or the Successor Corporation and his or her compensation have, to the extent known, been fully disclosed. No determination at this time has been made to change Robins' existing management or compensation structure immediately after the Confirmation Date.

As the Court has concluded, the instant Plan, unlike a usual conversion to Chapter 7 for liquidation, will afford all creditors' payment in full and each holder of a claim or interest will receive or retain under the Plan property of a value, as of the Effective Date, that not only is as much as the amount that such holder would receive or retain if Robins were liquidated under Chapter 7 of the Bankruptcy Code on that date but substantially more.

The payments into the Trusts provided for under Sections 5.01(b), 5.02(b) and 6.07 of the Plan are sufficient to pay all Allowed Dalkon Shield Personal Injury Claims, Allowed Dalkon Shield Liquidated claims and costs and expenses of the Trusts in full.

All fees payable under 28 U.S.C. § 1930 have been paid, and there are no rate changes provided for in the Plan that require the approval of any governmental regulatory commission. A conversion to Chapter 7 would be financially inexpedient to both the Debtor and the creditors in that it would have a negative effect on employees' morale and ability to maintain market share, hence diluting the value of operating assets.

The Robins Family Contribution is valuable consideration for the releases contained in Section 8.03 of the Plan, the injunction provided in Section 8.04 of the Plan, other terms and conditions of the Plan, and the benefits of the Other Claimants Trust.

The moneys and insurance policies anticipated to be contributed by Aetna pursuant to the terms of the Qualified *Breland* Settlement constitute valuable consideration for the inclusion of Aetna within the scope and protection of the releases contained in Section 8.03 of the Plan and the injunction provided in Section 8.04 of the Plan.

The scope and protection of the releases and injunctions provided in Sections 8.03 and 8.04 of the Plan are necessary and essential to avoid irreparable harm to the estate.

On June 13, 1988, this Court entered the Fee Cap Order capping the aggregate amount of Fee Claims of Noticed Professionals at the amounts set forth in the binding estimates filed by them on or before July 13, 1988, in accordance with the Fee Cap Order.

The equitable treatment of all Dalkon Shield Personal Injury Claimants, rehabilitation of the Debtor, and the success of the merger with AHP Subsidiary (9) Corporation requires the absolute termination of piecemeal litigation relating to or arising from the Dalkon Shield and the creation of a single facility.

The Plan and the transactions contemplated by it do not provide for and, when consummated, will not constitute the liquidation of all or substantially all of the property of the Debtor's estate.

The releases and injunction provided in Sections 8.03 and 8.04 of the Plan (collectively, the "Channeling Provisions") are an integral part of the compromises and settlements incorporated in the Plan. They are essential to the viability of the merger with AHP Subsidiary (9) Corporation and the post-confirmation operations of that corporation and provide for the successful implementation of the Plan and provide equality of treatment of similarly situated creditors, reorganization of and a "fresh start" for the Debtor, and a consensual plan of reorganization.

*Feasibility*

Section 1129 of the Code authorizes confirmation of a plan only upon inclusion therein of specified conditions.

The Court is satisfied that the instant Plan encompasses each of the § 1129 requirements and each has been addressed.

A fair reading of the Plan discloses that the feasibility of same is premised on con-

tinuing supervision by the Court of each of the Trusts. Feasibility of this Plan and the law requires this supervision to assure the accuracy of the Court's estimate, the full payment of all Dalkon Shield personal injury claims and allowed Dalkon Shield liquidated claims and to reduce the threat of personal liability of the Trustees and personnel of the Trusts. After the Trusts are established, the Trusts will operate independently of Robins and the duties of the Official Committee of Dalkon Shield Claimants and of the Future Claimants' Representative will have terminated except with respect to appeals, fee applications, and matters related to proposed modifications of the Plan. Under these circumstances, supervision of the Trusts by the Court is necessary and appropriate. Court supervision of the Trusts is sufficient under the facts of this case in that the Court is empowered under the law to approve all payments by the Trusts for services, costs and expenses in connection with the administration of the Trusts and to approve the employment by the Trusts of professionals and administrators, and otherwise to supervise the Trusts as provided for or allowed by the Plan and applicable law.

Sections 105, 1129(a)(4), and 1142 of the Bankruptcy Code and Sections 157 and 1334 of Title 28 of the United States Code as well as principles of equity empower and require the Court to maintain a continuing supervision in the manner aforesaid.

Additionally, the Court's supervision of the Trusts is consistent with the Plan and the Trusts. Section 3.03(c) of the Claimants Trust empowers the Court to remove Trustees of the Claimants Trust without a showing of cause. Section 3.04(a) of the Claimants Trust empowers the Court to appoint a successor Trustee of its own nomination if the remaining Trustees fail to nominate a successor Trustee that is approved by the Court within 60 days after the death, resignation, incapacity to serve or removal of a Trustee prior to the expiration of his or her term. Section 4.03(a) of the Claimants Trust provides that the Trustees are empowered to take actions pursuant to the Confirmation Order. Both Trusts require the filing of financial accountings with the Court. Section 8.05 of the Plan provides for broad retention of jurisdiction and although it does not include jurisdiction of the day-to-day operations of the Trusts. The supervision by the Court of payments for services or for costs and expenses in connection with the administration of the Trusts and of the employment by the Trusts of professionals and administrators is not supervision of the day-to-day operations of the Trusts.

*Summary*

This Court has jurisdiction to approve the Plan and its provisions and to enter the orders set forth herein, including, without limitation, the releases and injunction provided for in Sections 8.03 and 8.04 of the Plan and Paragraphs 33 and 34 of the Confirmation Order.

The claims and interests in each class are substantially similar to the other claims and interests in such class.

All unliquidated Dalkon Shield claims to which Robins has objected are not deemed allowed except for purposes of voting pursuant to the Voting Order and shall only be allowed as provided for in the Plan.

Robins, as the proponent of the Plan, has complied with all the applicable provisions of the Bankruptcy Code.

The Plan has been proposed in good faith and not by any means forbidden by law.

Based on the past profit performance and capital structures of AHP and Robins, the funding required in the Plan can be made, the Plan will succeed, and liquidation or further reorganization of the debtor after confirmation is not likely.

Section 1111(b)(2) of the Bankruptcy Code does not apply to the claims of any class, and no election pursuant to that section has been made in this case.

Any person now or hereafter asserting any right to payment against Robins based upon or in any manner arising from any Dalkon Shield, held a dischargeable claim against Robins at the commencement of the case if the Dalkon Shield to which such asserted claim relates was inserted before the commencement of the case.

The establishment of a bar date in this case was essential to the orderly development of a plan of reorganization and the equitable conclusion of this reorganization case.

Unless reinstated pursuant to the Plan, claims filed after the bar date established by the Court should be disallowed.

The transfers of property by Robins to the Successor Corporation (i) are or will be legal, valid and effective transfers of property; (ii) vest or will vest the Successor Corporation with good title to such property free and clear of all liens, charges, claims, encumbrances, or interests, except as expressly provided in the Plan; (iii) do not and will not constitute fraudulent transfers or conveyances under the Code or under the laws of the United States, any state, territory, possession or the District of Columbia; and (iv) do not and will not subject the Successor Corporation or its affiliates to any liabilities by reason of such transfer under the laws of the United States, any state, territory or possession thereof or the District of Columbia based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any theory of successor or transferee liability.

Robins' insurance policies, and the coverage thereunder, are property of the Debtor's estate under 11 U.S.C. § 541.

For the reasons set forth in the opinion to follow, unliquidated claims for punitive damages are disallowed.

Based on the facts of this case, in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code, no proceeds would be available for the payment of punitive damages or distribution to shareholders.

Nothing in the Bankruptcy Code, however, precludes payments in lieu of punitive or similar damages as part of a confirmed plan of reorganization as has been accepted by all impaired classes of claims and interests affected thereby.

Section 1334 of Title 28, Section 105 of the Bankruptcy Code and the general equitable powers of this Court confer upon it jurisdiction to enjoin proceedings in other courts, enjoin parties from commencing or continuing litigation, and to otherwise approve the channelling provisions in order to ensure: (i) the efficient administration of Robins' estate; (ii) the efficient administration of the Trusts; (iii) the systematic evaluation and payment of Dalkon Shield claims in an orderly, fair manner, applying the same rules to all; (iv) that the bulk of the funds in both Trusts are made available for the payment of Dalkon Shield personal injury claims pursuant to the same method of claims evaluation; (v) minimization of expenditures and transaction costs payable from the Other Claimants Trust, for protracted litigation of questionable value against third parties; (vi) successful consummation of the Plan; (vii) that Dalkon Shield personal injury claimants do not bypass the Claims Resolution Facility, to the detriment of other Dalkon Shield personal injury claimants; (viii) equality of distribution to Dalkon Shield personal injury claimants; and (ix) rehabilitation and reorganization of Robins, free from direct and indirect involvement in further Dalkon Shield litigation.

Payments on liquidated claims or to holders of equity security interests before unliquidated and/or disputed claims are liquidated are, in this instance, appropriate and do not violate the Bankruptcy Code.

The Court should and does accept the business judgment of the Debtor regarding the assumption of executory contracts absent unusual circumstances which are not present here.

In order to effectuate the Plan and provide for finality, the Court may allow indemnification, contribution, or reimbursement claims and provide that said claims be satisfied by the Other Claimants Trust and by the protection of the releases and injunctions.

Assumption and assignment of Robins' outstanding executory contracts and unexpired leases are in the best interest of the estate.

The "absolute priority rule" and the other provisions of 11 U.S.C. § 1129(b) are inapplicable to this confirmation.

The modifications to the Plan set forth in the Technical Modification Motion are technical changes required to correct typographical errors and to provide that the $100 million start-up payment and distributions contemplated by Section 6.07 of the Plan and described in the Disclosure Statement can be made and implemented. As such, those modifications do not require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

The AHP Common Stock to be issued in exchange for Robins Common Stock under the Plan is exempt from registration under state and federal law pursuant to section 1145(a)(1) of the Bankruptcy Code.

Except as provided in the Plan and Confirmation Order, the confirmation of the Plan will enjoin the commencement or continuation of any action, the employment of any process, and the doing of any act to collect, recover or offset any debt discharged by the Confirmation Order, by the Plan or by section 1141(d) of the Bankruptcy Code as a personal liability of Robins or its affiliates, or from property of Robins or its affiliates, whether or not discharge of any such debt is waived.

By virtue of confirmation of the Plan, any judgment at any time obtained will be void to the extent that such judgment is a determination of the personal liability of Robins with respect to any debt discharged by the Confirmation Order, by the Plan, or by Section 1141(d) of the Bankruptcy Code, whether or not discharge of any such debt is waived.

Upon entry of the Confirmation Order, the terms of the Plan will be binding upon Robins, the Successor Corporation, the Trusts and any and all creditors and equity security holders of Robins, whether or not the claims or interests of such creditors or equity security holders are impaired under the Plan and whether or not such creditors or equity security holders have accepted the Plan.

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a security under the Plan or the revesting, transfer or sale of any real or personal property of Robins in accordance with the Plan will not be taxes under any state or local law imposing a stamp tax, transfer tax or similar tax.

This Court, as a court of equity whose jurisdiction is governed by equitable principles, and pursuant to Section 105 of the Bankruptcy Code, has the constitutional and statutory power and authority to issue and enter the injunction and releases contained in the Plan. Due and timely notice of the injunction and releases has been given in a manner reasonably calculated under all the circumstances to apprise all those affected by the Plan and the Confirmation Order of the pendency of the hearing to consider the Plan, including the injunction and releases included therein, and afford all interested parties an opportunity to present their objections.

The Court may and will exercise its equitable power and authority to issue injunctive relief where there is a basis for concluding that reorganization or rehabilitation of Robins might be undermined and frustrated by the actions sought to be enjoined.

The Court has the power and duty to sift through the surrounding circumstances to prevent injustice or unfairness and has the power to and will, if required, create new remedies where those at law are inadequate.

The Court has the equitable and inherent power and authority to channel claims to a specific *res* and may limit the direct or indirect prosecution of such claims against Robins and prohibit parties in interest from attempting to circumvent the Plan and the orders of this Court.

In exercising its inherent equitable powers, the Court will, where justified, grant injunctive relief to prevent direct or indirect interference with the administration of the estate and facilitate the Robins reorganization effort to enable Robins to achieve the ultimate objectives of Chapter 11, reorganization and rehabilitation. The Court may enjoin or otherwise limit future litigation associated with this case that could

undermine and/or frustrate the Plan or Robins' reorganization.

The foregoing constitutes the Court's findings of fact and conclusions of law. The provisions of the Order of Confirmation are non-severable and mutually dependent.

An appropriate Order will issue.