In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.

Employer's Tax Identification No. 54–0486348.

Anthony SHUKIS, Florence A. Shukis and Jason E. Shukis, Movants,

v.

DALKON SHIELD CLAIMANTS TRUST, Respondents.

Bankruptcy No. 85–01307–R.

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

Nov. 14, 1994.

Theodore I. Brenner, Brenner, Baber & Janus, Richmond, VA, Anthony J. Nemo, Meshbesher & Spence, Ltd., St. Paul, MN, Joseph S. Friedberg, Minneapolis, MN, for movants.

Melody G. Foster, Dalkon Shield Claimants Trust, Richmond, VA, for respondents.

### MEMORANDUM

MERHIGE, District Judge, and BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter is before the Court on a motion by Dalkon Shield Claimants Anthony, Florence and Jason Shukis to interpret the Sixth Amended and Restated Plan of Reorganization of the A.H. Robins Company ("Plan") and the related documents under which the Robins Bankruptcy is being managed. The Movants have requested the Court to order that:

(1) The Plan requires the Dalkon Shield Claimants Trust ("Trust") to extend an individual settlement offer to each holder of an Option 3 Dalkon Shield claim, and claimants may make individual decisions regarding whether to accept or reject these settlement offers;

(2) The Trust's policy of extending joint Option 3 offers to family members in settlement of their Dalkon Shield claims, which eliminates the right of individual claimants to accept or reject their settlement offers, violates the Plan;

(3) Once the Trust extends a settlement offer to an Option 3 claimant, that claim may not be disallowed by the Trust or by this Court based upon the claimant's failure to make an election between Regular Arbitration and Trial within the arbitrary time periods established by the Trust; and

(4) The Trust is enjoined from threatening claimants holding compensable claims with disallowance for failing to make an election between Regular Arbitration and Trial within the arbitrary time periods established by the Trust.

This Court has the exclusive jurisdiction to interpret the relevant instruments and address these matters. *See* Debtor's Sixth Amended and Restated Plan of Reorganiza-

tion § 8.05, March 28, 1988, *confirmed by In re A.H. Robins Co.*, 88 B.R. 742 (E.D.Va. 1988), *aff'd* 880 F.2d 694 (4th Cir.1989), *cert. denied* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); *see also In re A.H. Robins Co., Inc.*, 972 F.2d 77 n. 1 (4th Cir. 1992) (affirming the Court's exclusive jurisdiction).

## I.

The Movants, Florence Shukis, her husband Anthony, and her son Jason, filed separate proofs of claims with this Court under Option 3 of the Claims Resolution Facility ("CRF"). They seek to recover damages arising out of birth injuries sustained by Jason allegedly as a result of his mother's use of the Dalkon Shield.[1]

The Movants received a joint offer in October, 1992, which they rejected on the grounds that it was "grossly inadequate." Subsequent to rejecting the offer, they proceeded through the In–Depth Review/Settlement Conference phase of the claims process. Their settlement conference was held on March 8, 1994, at which time the Trust provided the Movants with an apportionment of the offer into individual settlement amounts for Mr. and Mrs. Shukis and Jason. The Movants received a final offer on March 22, 1994.[2]

Mr. and Mrs. Shukis are willing to accept their portion of the settlement amount. Ja-

son, however, considers his portion of the offer to be inadequate and desires to proceed to arbitration or litigation. Current Trust policy, however, prevents the Movants from being able to accept in part and reject in part their offer; thus, they have petitioned this Court for interpretation of the plan.

## II.

■ The Movants first challenge the Trust's joint offer policy for related family claims. This policy has not always been utilized by the Trust.[3] In fact, when the Trust commenced the claims resolution process, related family claimants were presented with separate offers and were free to accept or reject these offers on an individual basis. Soon thereafter, however, the Trustees became concerned about potential inefficiencies associated with this system. Specifically, there was significant concern about double recoveries and the need for consistency in the claims resolution process.[4] Accordingly, they implemented a procedure by which family claimants are extended a single joint offer. To effectuate acceptance, all family members to whom the offer extends are required to sign a common Option 3 release. If one or more family members wishes to reject the offer and refuses to sign the release, the entire offer is treated as rejected and all the family members must proceed to arbitration or litigation.

---

1. Jason's injuries include congenital atresia of the left ear, hearing loss in the left ear, hearing loss in the right ear secondary to congenital middle ear defects and subsequent surgical repair.

2. Ordinarily, claimants have ninety days in which to accept or reject an offer, and if the claimant fails to respond, the offer is withdrawn. In the instant matter, counsel for the movants asked the Trust to keep the offer outstanding while they prepared and filed their motion to interpret with this Court. The Trust acquiesced to this request on June 1, 1994, and the Movants filed their motion on September 16, 1994.

3. The only exception is that the Trust has always sent joint offers to family claimants where the child has catastrophic birth injuries or congenital defects requiring life-long care. Respondent's Response Memorandum at 5 n. 2.

4. The Trust notes that the original offer policy created the potential for double recovery, especially where infant estate claims were involved

(*i.e., claims by the parents of still born children*). In short, the situation existed whereby parent claimants could accept their settlement offers and, as beneficiaries of their child's estate, reject the nominal offer extended to the deceased infant. The infant's claim could then proceed through the In–Depth Review/Settlement Conference phase of the process and eventually end up in litigation or arbitration. At this stage, the infant's claim would essentially be a wrongful death claim in which the parents are attempting to recover the identical emotional pain and suffering damages that they recovered via their individual offers. The adoption of a joint offer policy eliminates such parental double recovery.

The Trust also notes that an individual offer policy created the potential for not only multiple offers, but multiple settlement conferences and multiple adjudications or arbitrations and, thus, potentially different recoveries for the same injury.

The Movants challenge this procedure. In so doing, they assert that the joint offer policy violates an alleged individual offer policy established by the Plan and related instruments and that the Trust has no authority to mandate joint releases. They also argue that the Trust's joint offer policy offends the Plan's goal of encouraging settlement. In response, the Trust argues that the joint offer policy is a day-to-day operational issue authorized under the Plan and consistent with the Trust's ultimate goals.

As already noted, this Court retains jurisdiction over the Trust for many purposes. This power, however, is not without limit. Section 8.05 of the Plan specifically states that "nothing contained in this Section 8.05 is intended to confer jurisdiction upon the Court over, or grant authority to monitor, the day-to-day operations of the Trusts or the Claims Resolution Facility." Debtor's Sixth Amended and Restated Plan of Reorganization § 8.05. The responsibility for resolving Dalkon Shield claims resides with the Trust, Claimant's Trust Agreement ("CTR") § 2.02, and, in this regard, the Trustees are vested with broad authority to "effectuate the purposes of the Trust," including the power to do "what they deem reasonably necessary or desirable for the proper management of the Trust." Claimant's Trust Agreement ("CTR") §§ 4.03(a), (b)(xxi). In exercising this power, however, the Trustees may not act in a manner inconsistent with the provisions of the Plan, the CRF or the CTR. *Id.* at § 4.03(b)(xxi).

The vesting of broad discretionary power in the Trust requires that the Court be cautious when entertaining a claimant's challenge to Trust decisions. Indeed, it would be impractical and contrary to well established policy for this Court to interfere with Trust operations every time a disgruntled claimant expressed disagreement with Trust policy. Accordingly, the Court has established a heightened standard that a claimant must satisfy in order for the Court to even *consider* examining a challenged policy. In order to obtain relief from a decision committed to the Trust's discretion, "the movant must show facts or issues that elevate the matter above the level of ordinary operations." *Mantush v. Dalkon Shield Claimant's Trust,* Docket No. 18298, at 4 (May 25, 1994).

The Movants are challenging a Trust policy properly adopted by the Trustees. Moreover, this policy clearly implicates the day-to-day operations of the Trust. If the only argument set forth by the Movants was that the instant issue failed to encourage settlement, the Court would be obliged to end the inquiry at this point. *See e.g., Gunnell v. Dalkon Shield Claimant's Trust,* Docket No. 19331 (August 16, 1994) (claimant's assertions did not raise the contested matter above the level of daily operations). The Movants, however, challenge this policy on a more fundamental and substantive basis. In short, they have proposed that the Trustees, in replacing individual offers and releases with joint offers and releases when related family claims have been filed, exceeded their authority and acted in a manner inconsistent with the Plan and related instruments. Importantly, they have set forth specific facts and policy arguments in support of this position. The Court thus concludes that the Movants have established that their challenge to the joint offer policy is more than a mere complaint about ordinary operations and, on this basis, will proceed to evaluate the motion.

The appropriate standard for reviewing Trust actions was established in *Besag v. Dalkon Shield Claimants Trust,* Docket No. 19492 (August 29, 1994). Under *Besag,* an action is outside the Trust's authority only where the action (1) violates a provision of the Plan, the CRF or the CTR, or (2) "fails to fully, fairly, and expeditiously serve individual claimants as well as the group of all claimants." *Id.* at 9–10. The latter prong requires that the Trust balance the often competing interests of individual claimants against the aggregate interests of claimants as a group. Given the Trust's superior expertise in resolving claims, it is vested with great discretion to decide the proper balance. *Id.* If, however, the Trust has conducted this balancing in an improper or unfair manner, though unintended to be so, and either individual interests or group interests are

thereby sacrificed, the action is "outside the authority of the Trust unless the Trust shows that the unfairness is absolutely unavoidable given its larger purpose." *Id.* at 11.

In the instant case, it is not at all clear that the Trust's joint offer policy violates the Plan or any related document, despite the Movants assertions to the contrary.[5] The Court, however, does not decide this issue because it concludes that the Movants' interests have been unfairly sacrificed by the Trust's joint offer policy and that the Trust has failed to show the absolute unavoidability of this result.

There is no doubt that the Trust balanced the interests of individual claimants against the interests of claimants as a group when it abandoned the individual offer policy for related family claimants. In fact, the Trust has cited, as the basis of this policy change, its concerns about double recoveries and inconsistencies and inefficiencies in the claims resolution process. *See supra* note 4. While these are weighty concerns, the Trust, in the Court's opinion, seems to have gone too far when it completely revamped the related family claims offer policy.

With respect to double recoveries, the Trust only notes that this is a potential problem when infant estate claims have been asserted by the deceased infant's parents. The Trust does not argue that the danger of parental double recovery is present where the child is alive, handicapped by a congenital birth defect, and in disagreement with the amount of a joint offer allocated to his or her injuries. Indeed, a double recovery is not possible under those circumstances as the child's award will ordinarily include his or her own medical expenses and wage losses, not the parent's emotional damages. If the Trust, quite properly, wanted to limit double

recoveries, it seemingly could have done so in a more narrow and equitable manner. For example, the Trust fails to state why it could not have merely extended its preexisting joint offer policy covering claims where the child has catastrophic birth injuries to infant estate cases, thus leaving child claimants such as Jason Shukis, who has reached maturity, free to challenge the tendered award.

There is also no indication that the Trust could not have addressed differently its concerns regarding efficiency and consistency. For example, if the Trust was concerned about multiple settlement conferences resulting from the extension of individual offers to related family claimants, was it not possible to establish a policy requiring such claimants to attend a common settlement conference?[6] Likewise, could the Trust not have developed a more narrow policy addressing concerns about family members rejecting at different times and choosing different dispute resolution mechanisms?

■ In setting the joint offer policy, the Trust chose none of these alternatives. Instead, it initiated a blanket policy covering all related family claims. While it is true, as the Trust argues, that this policy has yielded some favorable results,[7] it has also placed an unfair burden on claimants such as the Shukis'. Specifically, an injured child who is dissatisfied with his or her portion of the joint offer, but has parents ready to accept their portion of the offer is placed in a Catch .22 situation. The child, through its guardian, must effectively either agree to the entire offer, thus sacrificing his or her opportunity to be more fully compensated for the birth-related injuries, or reject the offer, effectively forcing his or her guardian into arbitration or litigation. In the latter scenario, the par-

---

5. Specifically, the Movants assert that the joint offer policy violates the Plan and related documents in that (1) sections E.3 and E.4 mandate an individual offer policy; and (2) the joint offer and release policy prevents claims from becoming allowable and properly payable, pursuant to CTR § 5.01(a), thus violating the Trust's purpose of assuming and fully, fairly and expeditiously satisfying claims, as set forth in CTR § 2.02.

6. Presumably, related family claims are generally submitted together as they result from a common injury or injuries. Thus, the Trust could, at the

time the family claims are submitted, inform the claimants that only one settlement conference is permitted to consider their claims.

7. For example, the Trust notes that "[f]or family claims with a joint offer equal to or greater than the Movants', the acceptance rate since the joint offer policy has been implemented has skyrocketed 23.8%" to 95.2%. Response at 15. The Trust also cites elimination of the aforementioned concerns (i.e., double recovery). *Id.*

ents most likely sacrifice their own damages awards and needlessly incur the expenses associated with arbitration or litigation. Burdens of this nature are only warranted where the Trust proves that they are "unavoidable" given its larger purpose of efficiently, fully and fairly resolving claims. As noted above, the Trust, in this instance, has failed to establish this burden.

■ Therefore, the Court will order that the Trust shall, within fifteen days, explain why it cannot achieve its purpose of efficiently, fully and fairly resolving claims without a blanket joint offer policy covering all family related claims; or, in the alternative, report to the Court that it has modified its offer policy to provide some sort of relief to related family claimants who assert non-infant estate claims.

### III.

■ In February, 1994, the Trust realized that a large number of claimants whose offers had been withdrawn for a year or more had failed, as yet, to make the mandatory election between arbitration or litigation. Because of resulting congestion in the CRF, the Trustees, in an effort to accelerate the processing of these claims, imposed a deadline of September 1, 1994, by which delinquent electees were required to make the arbitration/litigation election.[8] Claimants were notified of this deadline by letter. This letter also warned that "the Trust will begin further steps leading to the disallowance of your claim" if the election was not made by the stated date. *See* Letter to Claimants, Motion to Interpret, Exh. B. The Trust notes, however, that the deadline is not final and the failure to meet this deadline will not result in automatic disallowance. Response at 19.

The Movants challenge the validity of this deadline, arguing that the Trust may not disallow claims previously characterized as compensable. While both sides have developed their positions, the Court will not fully reproduce their arguments for the simple reason that this matter is not ripe for adjudication. The Trust admits that the deadline is not final and that the failure to comply with the deadline has not resulted in automatic disallowance. Indeed, no one has, as yet, been disallowed for failing to make their election. For claimants who failed to respond by the deadline, the Trust will notify them of a final deadline and make a final determination regarding disallowance if that deadline is disregarded. Thus, the Trust has further procedures in place to handle claimants who, at this stage, have received an initial deadline letter and have failed to make the required election. Until a claimant has completed this process, his or her claim is not ripe for consideration by this Court, and the "threat" of disallowance is insufficient to overcome this infirmity. *Cf. Almalich v. Dalkon Shield Claimant's Trust,* Docket No. 19103 at 5 (July 29, 1994) ("The Court is reluctant to intervene in Trust matters on behalf of claimants who have not exhausted their Trust remedies"). Thus, the Court will not enjoin the Trust from notifying delinquent claimants that their claims may be disallowed for continued disregard of Trust deadlines.[9]

■ The Court notes, however, that even if the matter was ripe, the Court would be extremely hesitant to, and on the instant record would not set aside the Trust's election deadline. In so concluding, the Court is mindful of the Movants' argument that the Trust may not disallow a claim once such claim has been characterized as compensable. The Movants base this assertion on section 1.48 of the Plan which defines "disallowed claim" as one "which has been determined under the appropriate Trust Agreement not

---

8. The Trust has actually established a rolling policy whereby any claimant who has failed to elect within one year of their offer being withdrawn will face a ninety day deadline to make their election. Response at 8 n. 3.

9. While it is, in fulfilling the Court's responsibility to the instant litigants, unnecessary to discuss the pending issue further, the Court does so

primarily for the benefit of unrepresented claimants. Fairness dictates that they be alert to the danger of ignoring election deadlines set by the Trust. The duty and immediate goal of the Trustees is the fair settling of all timely claims followed by the settling of all untimely claims. This goal may be accomplished only by setting rules and deadlines to which claimants must adhere.

to be compensable." Plan § 1.48. The Movants assert that disallowing an otherwise compensable claim for failure to satisfy a deadline is inconsistent with section 1.48 and, thus, in violation of the Trust's discretionary powers. *See* CTR §§ 4.03(b)(xii) and (xxi).

The Court rejects this narrow interpretation of Plan section 1.48. Nothing in the language of this section indicates that the Trust may not, in a valid exercise of discretion under the Claimants Trust Agreement or other Trust instrument, impose a deadline and disallow any stalled claims remaining upon the passing of the deadline. In effect, failure to act on or before the deadline renders a claim non-compensable within the meaning of section 1.48, regardless of that claim's previous status. Any contrary ruling could open the door to perpetual claims, a clearly unacceptable result given the Trust's larger goal of expediently satisfying all claims and winding down the Trust. In short, the interests of the group of claimants as a whole necessitates the setting of deadlines to dislodge claims stalled in the claims resolution process.

█ Finally, the Court notes that this conclusion is completely consistent with prior decisions of this Court. Indeed, the Court has, on several occasions, upheld Trust deadlines. *See Almalich v. Dalkon Shield Claimant's Trust,* Docket No. 19103 (July 29, 1994) (deadline regarding submission of claims material within day-to-day operations); *Gunnell,* Docket No. 19331 (ADR deadlines within day-to-day operations). Moreover, the Court has affirmed the Trust's disallowance authority. *See e.g., Almalich,* Docket No. 19103 (affirming disallowance of claims for failure to submit final claim materials by the stated deadline); *Mantush,* Docket No. 18298 (recognizing Trust authority to disallow claims for failing to select an option by July 1, 1991 deadline); *Besag,* Docket No. 19492 (affirming Trust authority to disallow potentially fraudulent claims). Quite simply, the setting and enforcement of the election deadline is a matter of day-to-day operations with which this Court will not interfere absent exceptional circumstances.

An appropriate Order will follow.

## *ORDER*

This matter is before the Court on a motion by Dalkon Shield Claimants Anthony, Florence and Jason Shukis to interpret the Sixth Amended and Restated Plan of Reorganization of the A.H. Robins Company ("Plan") and the related documents under which the Robins Bankruptcy is being managed.

Upon due consideration, for the reasons set forth in the accompanying memorandum this date filed and deeming it just and proper so to do, it is ADJUDGED and ORDERED as follows:

(1) Movant's motion be and the same is hereby GRANTED, and the Court issues its interpretation in the accompanying Memorandum this date filed.

(2) The Trust shall within fifteen days of this date:

(a) explain why it cannot achieve its purpose of efficiently, fully and fairly resolving claims without a blanket joint offer policy covering all family related claims; or

(b) report to the Court that it has modified its offer policy to provide some sort of relief to related family claimants who assert non-infant estate claims.