In re A.H. ROBINS COMPANY, INC.,
Debtor, Employer Tax Identification
No. 54–0486348.

Kathryn M. BESAG, et al., Movants,

v.

DALKON SHIELD CLAIMANTS
TRUST, Respondent.

No. 85–01307–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 29, 1994.

David S. Sabih, David S. Sabih & Associates, Torrance, California, for Kathryn M. Besag, et al.

Orran Lee Brown, Richmond, Virginia (Michael W. Smith, Christian, Barton, Epps, Brent & Chappell, on the briefs), for Dalkon Shield Claimants Trust.

## MEMORANDUM

MERHIGE, District Judge.

This matter is before the Court on a motion by Dalkon Shield Claimant Kathryn M. Besag, et al., for an interpretation of various portion of the Reorganization and the Claims Resolution Facility under which the A.H. Robins bankruptcy is being managed. Movants ask several questions requiring this Court to interpret portions of: (1) the Debtor's Sixth Amended and Restated Plan of Reorganization ("Plan"), March 28, 1988, confirmed by *In re A.H. Robins Co.*, 88 B.R. 742 (E.D.Va.1988), *aff'd,* 880 F.2d 694 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); (2) The Dalkon Shield Trust Claims Resolution Facility ("CRF"), *id.* at appendix C; and (3) this Court's Amended Administrative Order Number 1 Governing Dalkon Shield Arbitration and Litigation ("Administrative Order"), July 1, 1991 (nunc pro tunc June 26, 1991), *In re A.H. Robins Co.*, No. 85–01307–R (E.D.Va.). This Court has *exclusive* jurisdiction to interpret these instruments.[1]

Movants and the Dalkon Shield Claimants Trust ("Trust") have ably argued their positions. However, the Court declines to repeat those arguments in this memorandum because repeating them can only serve to cloud that which the Court finds to be crystal clear language in its decrees. The Court also finds it inappropriate to present its interpretation in the precise format of the questions, which the Court finds to be unnecessarily compound and complex, and which seek specific rulings devoid of context.[2]

The Court will list Movants' questions verbatim, then address the fundamental issues they present. Movants ask:

1. Does a motion by a litigant to a state court for application of collateral estoppel on the issue of product defect against the Trust, which motion, in part, cites provisions of the CRF, specifically language directing the Trust to minimize costs, and § E.5.(b) allowing the Trust to concede product defect, constitute a request for a court,

---

1. Section 8.05 of the Plan states:
    8.05 *Retention of Jurisdiction.* Notwithstanding entry of the Confirmation Order or the Consummation Date having occurred, the Court will retain jurisdiction ... (c) to resolve controversies and disputes regarding interpretation and implementation of the Plan, the Trust Agreements, the Claims Resolution Facility ...
    Debtor's Sixth Amended and Restated Plan of Reorganization [*Plan*], March 28, 1988, confirmed by *In re A.H. Robins Co.*, 88 B.R. 742 (E.D.Va.1988), *aff'd,* 880 F.2d 694 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). Amended Administrative Order Number 1 states:
    3. This Court retains jurisdiction as provided by Section 8.05 of the Plan, and by applica-

ble law, including exclusive jurisdiction as against and Arbitration or Litigation:
    a. to resolve controversies and disputes regarding interpretation and implementation of the Plan, the Trust Agreements, the CRF....
Amended Administrative Order Number 1 Governing Dalkon Shield Arbitration and Litigation [*Administrative Order*] ¶ 3, July 1, 1991 (nunc pro tunc June 26, 1991), *In re A.H. Robins Co.*, No. 85–01307–R (E.D.Va.).

2. The Court intends no criticism of Movants, and hastens to add that the Trust's recasted questions are equally unsuitable. The Court appreciates that able advocates will advocate, but chooses to deliver its interpretation in a neutral framework.

other than this Court, to interpret the Plan?

2. If the answer to the preceding question is "yes," does that request violate Paragraph 3 of Amended Administrative Order Number 1 in the absence of notification by the Trust that said citation, in its view, constitutes a controversy to be resolved by this Court?

3. Assuming a party in state litigation between a claimant and the Trust notifies the other party that in its view the first party has impermissibly asked a court other than this Court to resolve a controversy concerning the Plan, and that thereafter the first party withdraws the motion or argument, has the first party acted consistently with Amended Administrative Order Number 1 by avoiding a controversy once it was identified?

4. Assuming that in litigation between the Trust and a claimant the Plan or CRF is cited in support of a one [sic] party's view of a controversy over a doctrine of state law, or over an evidentiary matter, does that citation violate the Amended Administrative Order Number 1 by asking a court, other than this Court, to interpret the Plan? In other words, may a litigant ask a court other than this Court to interpret the Plan not in connection with a controversy under the Plan but in connection with a controversy under state law?

5. If a litigant in state court against the Trust complains of limitations in discovery under the Plan in support of a motion under state law for issue preclusion based on the alleged destruction of documents by Robins officials, has that litigant asked the state court to resolve a controversy in interpretation of the Plan in violation of Amended Administrative Order Number 1?

6. Assuming the trust, or a claimant, believes that a particular argument before a court other than this Court involves interpretation of the Plan or CRF, what is the proper procedure to be utilized by the parties to expedi-

tiously and inexpensively resolve that difference without threatening or bringing contempt of court litigation before this court?

7. What should be the Trust's position with respect to settlement of cases?

8. Does the Trust have the power to refuse to process cases administratively by putting them on "hold" when irregularities are suspected?

Second Amended Motion, pp. 2–4.

*What is the scope of the Court's retained exclusive jurisdiction to "resolve controversies and disputes regarding interpretation and implementation" of the Plan and the CRF?*

■ The first several of Movants' questions turn on the meaning of the word "interpretation"—precisely what does this Court reserve to itself when it retains exclusive jurisdiction to "interpret" the Plan and the CRF? The Court uses the terms "interpret" and "interpretation" in their plain and ordinary meanings. According to Black's Law Dictionary, "interpretation" is "[t]he art or process of discovering and ascertaining the meaning of a statute, will, contract, or other written document," or "[t]he discovery and representation of the true meaning of any signs used to convey ideas." Black's Law Dictionary, 817 (6th ed. 1990). Therefore, to the extent that any language in the Plan or CRF is ambiguous, obscure, capable of more than one plain and ordinary meaning, or otherwise in need of "discovery," this Court retains exclusive jurisdiction to determine what that language means.

■ It may be helpful to delineate what is *not* interpretation. First, a straightforward reading, understanding, or application of the plain and ordinary meaning of the Plan or CRF provisions is not interpretation. The Court would see little point in recording its decrees without the *expectation* that persons will read, understand, and apply them. This Court notes that courts in general are particularly well suited to read, understand, and apply the plain and ordinary meaning of our common language—they do so constantly as a essential part of their function—and doing

so does not constitute "interpretation" as meant here.

■ Therefore, if, for example, a party who is not certified to proceed with litigation violates the CRF by suing the Trust, the Trust may support, with the pertinent CRF provisions, a motion to stay the suit. If, for example, either party in litigation fails to abide by the discovery provisions in the Administrative Order, the other party may bring the pertinent provisions to the court's attention. In neither case has a party, merely by bringing this Court's decrees to the attention of another court, asked the other court to "interpret" plain and undisputed language.

■ Second, an assessment of the *effect* on local matters of the plain, ordinary meaning of language in the Plan or CRF is not an interpretation of the language. Black's Law Dictionary is again instructive:

'[C]onstruction' is a term of wider scope than 'interpretation;' for, while the latter is concerned only with ascertaining the sense and meaning of the subject-matter, the former may also be directed to explaining the legal effects and consequences of the instrument in question. Hence interpretation precedes construction, but stops at the written text. Interpretation and construction of written instruments are not the same. A rule of construction is one which either governs the effect of an ascertained intention, or points out what the

court should do in the absence of express or implied intention, while a rule of interpretation is one which governs the ascertainment of the meaning of the maker of the instrument.

*Black's*, 818.

■ Therefore, a court is not engaging in "interpretation" when it accepts the straightforward meaning of a provision in the Plan or CRF and assesses the provision's effect on local events. For example, if a court, whether at the request of a party or sua sponte, takes note of the Plan's immunity provisions for former officers of A.H. Robins in ruling on requests for subpoenas or joinder of parties, that court is not "interpreting" the Plan.[3]

■ In sum, "interpretation" does not include reading, understanding, applying, or assessing the local effect of the plain, ordinary meaning of language. It does include ascribing any meaning to the Plan, CRF, or related instruments that is neither plain on the face of the words nor pronounced by this Court. Therefore, a party who seeks to induce another court to ascribe a meaning to the Plan, CRF, or related instruments that is not plain on the face of the words is seeking an interpretation in violation of this Court's decrees.

*What should parties do in the event of "controversies and disputes"?*

■ Movants and the Trust ask for guidance on how to recognize a controversy or

---

**3.** This request to interpret the Plan arose from a similar circumstance. Movant and the Trust were in litigation in a California court. Movant asked the California court to estop the Trust from denying product liability, on the basis of various provisions in the Plan and CRF. Those provisions required the Trust to minimize costs, forbade the Trust from disputing product defect during the pre-litigation claims resolution process, and authorized the Trust to consider stipulating to product defect in litigation. The Trust objected on the basis that Movant's request for estoppel amounted to a request to interpret the Plan and CRF. Appropriately, the parties brought the dispute to this Court.

Insofar as Movant's request for estoppel presented the exact language of the Plan and CRF, without seeking to attribute additional meaning to the words, Movant did not request an interpretation of the Plan or CRF. However, it is difficult for this Court to imagine how the provisions

offered by Movant could be given estoppel effect without ascribing considerably more meaning to the words than is present on their face. The language directing the Trust to minimize costs carries no apparent meaning regarding product defect. The language directing the Trust to forego asserting a particular defense refers to the expedient processing of hundreds of thousands of claims under review for settlement offers. Other language permits, but does not require, the Trust to forego the defense in a litigation context.

This Court is not aware of any law of estoppel that would construe the exact language of these provisions, directed at efficient management of hundreds of thousands of claims in a settlement process, as barring a defense in traditional one-on-one litigation. To the extent that Movant asked to Court to reach estoppel by adding meaning to the face of the language, Movant sought to violate this Court's exclusive jurisdiction.

dispute when one appears. This Court is confident that able advocates as well as persons of ordinary intelligence know a dispute when they see one. This Court declines to pronounce a prerequisite set of criteria or events.

If interested persons reasonably or unreasonably disagree on the plain meaning of words in the Plan or CRF, or if the meaning is obscure or *capable* of controversy, in any context, any claimant or the Trust *should do* exactly what Movants have done—bring the matter to this Court with a request to interpret. If time is of the essence, the movant may request expeditious treatment, and may request any injunctive remedy within this Court's jurisdiction.

*Is it within the Trust's authority and consistent with its purpose to refuse to enter settlement negotiations after its best-and-final offer has been withdraw or refused?*

■■■■ This question probes the amount of discretion residing in the Trust. The Trust's position is that it may take any action not expressly forbidden by the Plan, CRF, or related instrument. Movants's position is that any Trust action without express authorization is suspect. Both positions are in error. The Trust does not enjoy free-wheeling power to do whatever it deems appropriate in areas not addressed by Trust instruments, nor is it to be hamstrung by a miserly reading of its clearly broad mandate.

The Trust Agreement grants great discretion to the Trustees, as follows:

> Pursuant to the Confirmation Order, subject to the limitations set forth in this Agreement, and subject to the provisions and limitations of the Plan and the Claims Resolution Facility, the Trustees shall have the power to take any and all actions as, in the sole judgment and discretion of the Trustees, are necessary or advisable to effectuate the purposes of the Trust.

Claimants Trust Agreement § 4.03(a). As clearly stated, the Trust's great discretion is limited by other provisions of the Agreement, Plan, and CRF. The most fundamental limitation is the very purpose of the Trust, "to satisfy fully, fairly and expeditiously as practicable, all Dalkon Shield Personal Injury

Claims." Claimants Trust Agreement § 2.02.

■■■■ Therefore, the Trust's broad authority is limited to those actions that serve to fully, fairly, and expeditiously satisfy all Dalkon Shield claims. The Court recognizes that the phrase "all Dalkon Shield Personal Injury Claims" imposes a double burden on the Trust. The Trust must treat *each* claimant fully, fairly, and expeditiously, while it also must ensure that each claimant's individual treatment does not hamper full, fair, and expeditious treatment of the group of *all* claimants. Obviously, in this regard the Trust should refuse payment in the absence of a conclusion either that payment is appropriate in the interest of saving excessive administrative costs, or that the Trust is legally liable under the Plan.

■■■■ · The role of this Court is to check Trust actions that are outside its authority, not to second-guess actions within its authority. In keeping with the clear intent of the Plan to vest broad discretion in the Trust, and in acknowledgement of the Trust's superior direct experience in large-scale administrative processing of claims, this Court will not lightly declare a Trust action to be without authority.

The answer to Movants question, then, is that in the absence of a showing that the Trust's settlement policy fails to fully, fairly, and expeditiously serve individual claimants as well as the group of all claimants, and in the absence of a showing that the policy violates some other provision in a Trust instrument, the policy is within the Trust's authority.

*Is the Trust's refusal to. process claims involving suspected fraud or other irregularities within its authority and consistent with its purpose?*

■■■■ This ·question challenges the Trust's "administrative hold" policy, which is neither expressly authorized nor expressly prohibited in the Plan, CRF, or Court decree. Under this policy, when the Trust suspects a claimant of engaging in fraud or some other wrongdoing, it refers its suspicions to an enforcement authority, such as the Postal Inspector, and puts the claim on administra-

tive hold pending the outcome of the enforcement authority's investigation. While on administrative hold, the claim receives no further processing.

The Court is concerned about the position of the claimant on administrative hold. He or she cannot pursue the claim elsewhere until the Trust completes its processing of the claim, nor can the claimant appeal a Trust decision before the Trust makes it. At present, the claimant on administrative hold has no recourse but to wait indefinitely until the Trust resumes processing.

 The Trust argues that its administrative hold policy is essential to its fiduciary duty to the group of all claimants. However, to be within the Trust's authority, an action must fully, fairly, and expeditiously serve individual claimants as well as the group of all claimants. Where the interests of the individual claimant may conflict with the interests of the group of all claimants, the Trust must strike a balance between the two, and the Trust has great discretion in deciding the proper balance. However, in this instance, the Trust seems unintentionally to have sacrificed the individual for the group rather than to have balanced divergent interests.

■ It is beyond dispute that administrative hold is unfair to the honest individual claimant, who is foreclosed from any remedy on the basis of an unreviewable administrative suspicion of wrongdoing. An unfair action is outside the authority of the Trust unless the Trust shows that the unfairness is absolutely unavoidable given its larger purpose. Therefore, it is incumbent on the Trust to show that it cannot perform its mission to all claimants without putting some claimants on administrative hold. The Trust must state why, for example, a straightforward denial of claims lacking in credibility would prevent it from satisfying all claimants and from efficiently managing Trust operations.

Therefore, this Court will order that the Trust shall, within fifteen days, explain why it cannot achieve its purpose to fully, fairly, and efficiently satisfy all claims without using administrative hold; or, in the alternative,

shall report to the Court that it has modified its administrative hold policy to afford some form of recourse to every claimant; or, in the alternative, shall report to the Court that it has discontinued its administrative hold policy and is processing all claims.

■ The Court notes that the Trust could, if it deemed it appropriate, achieve continued processing of claims currently on administrative hold by simply disallowing suspect claims, thereby giving those claimants an avenue of appeal to this Court.