**In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.**

**Employer's Tax Identification No. 54–0486348.**

**DALKON SHIELD CLAIMANTS TRUST, Movant,**

v.

**Pamela CROMBIE, Respondent.**

**No. 85–01307–R.**

United States District Court, E.D. Virginia, Richmond Division.

May 15, 1998.

Montgomery W. Mackey, Chicago, IL, for claimant.

Melody G. Foster, Richmond, VA, for Dalkon Shield Claimants Trust.

## MEMORANDUM

MERHIGE, District Judge.

This matter is before the Court on the Dalkon Shield Claimant Trust's (the "Trust") Motion To Vacate Arbitration Decision. Pamela Crombie ("Ms.Crombie") opposes the Trust's motion. The Court has heard argument on the motion and the matter is ripe for disposition. For the reasons which follow, the Court will GRANT the motion.

### I.

Ms. Crombie is a Dalkon Shield claimant who claims that she has suffered injuries as a result of her use of the Dalkon Shield IUD. After giving birth to a child in 1971, Ms. Crombie had a Dalkon Shield inserted in 1974. For five years, she did not experience any problems with the Dalkon Shield. In June 1979, however, Ms. Crombie developed acute abdominal pain, strong cramping, a foul vaginal discharge, and a fever. She was immediately taken to the emergency room where she had the Dalkon Shield removed and was treated with antibiotics. Ms. Crombie fully recovered several days later.

In March 1980, Ms. Crombie underwent a laparoscopy which disclosed massive peritoneal adhesions around the fallopian tubes and ovaries. During a follow-up laparotomy in August 1980, the adhesions were cut and the fallopian tubes were found to be in good

condition. Two months later, Ms. Crombie became pregnant but unfortunately miscarried. In November 1981, Ms. Crombie underwent another laparoscopy which revealed that although a few adhesions had reformed, the fallopian tubes were still normal. The surgeon who performed the laparoscopy, Dr. John Mills, found that Ms. Crombie was fertile and recommended that she attempt to get pregnant for six months before seeing another fertility expert. In October 1982, Ms. Crombie underwent a third laparoscopy which disclosed that more adhesions had formed around the right fallopian tube and ovary. A laparotomy was performed in November 1983 to lyse those adhesions. Ms. Crombie then underwent another laparotomy in 1983 after which she suffered severe postoperative infections which completely damaged her fallopian tubes and rendered her unable to conceive except via in-vitro fertilization ("IVF").

From 1984 to 1992, Ms. Crombie made fourteen IVF attempts. She became pregnant three times, and finally had a daughter in 1990. Through a Special Program set up by the Trust pursuant to an "Emergency Fund" described in Section K of the Claims Resolution Facility ("CRF"),[1] Ms. Crombie was reimbursed the maximum allowable of $15,000.00. Ms. Crombie subsequently elected to pursue her claim under Option 3 of the CRF and rejected the Trust's offers of compensation, instead choosing to resolve her claim through binding arbitration.

Ms. Crombie's arbitration hearing was held on March 10–12, 1997, in Chicago, Illinois, before Arbitrator Stephen E. Smith ("Arbitrator Smith"). At the hearing, Ms. Crombie argued that the Dalkon Shield had caused her to develop an infection in June 1979 which traveled through her fallopian tubes and into her peritoneal cavity, causing the massive adhesions first seen in March 1980. Ms. Crombie further argued that her subsequent laparoscopies, laparotomies, and infections were all causally linked to that initial infection and the Dalkon Shield. The Trust argued, however, that the 1979 infection did not lead to an ascending infection in Ms. Crombie's fallopian tubes or to peritonitis and thus, her permanent infertility and subsequent IVF attempts were not attributable to the Dalkon Shield. Rather, the Trust argued that Ms. Crombie's post–1981 surgeries were unnecessary and that these surgeries, which resulted in infections that ultimately blocked Ms. Crombie's fallopian tubes, were a superseding and intervening cause of her permanent infertility.

In addition to presenting the medical testimony of her doctors, Ms. Crombie took the stand on her own behalf. She testified about her numerous IVF attempts and submitted medical expenses totaling $132,479.03—an amount which included the $15,000 for which she had already been reimbursed by the Trust. On cross-examination, the Trust introduced the IVF reimbursement checks in order to establish the amount to be deducted

---

1. Section K of the CRF directed the Trustees to establish a program for "providing immediate payments to qualified claimants who would benefit from reconstructive surgery or in-vitro fertilization. Such payments shall not exceed $15,000 for any one claimant and would be credited against the compensation subsequently awarded to the claimant pursuant to the Claims Resolution Facility."

   In order to qualify for participation in this program, claimants were not required to prove causation (Docket No. 2914), but they were required to sign a Release Agreement which provided in relevant part as follows:

   **2. BENEFITS.** In consideration for my agreements and acknowledgments contained in this document, the Trust agrees to evaluate my application for certain benefits, up to a maximum of $15,000, under the Special Program. *I understand that any benefits granted under the Special Program are, in effect, an advance against my claim pending before the Trust for possible damages arising from use of the Dalkon Shield.* I agree that payments made to me by the Trust under the Special Program WILL BE DEDUCTED FROM ANY AMOUNTS I MAY LATER BE ENTITLED TO RECEIVE from the Trust. (emphasis added and in original). Furthermore, in order to receive reimbursement, claimants were required to execute a Special Program Payment Request Form which stated:

   I understand I am eligible to receive up to Fifteen Thousand Dollars ($15,000) for payment of my medical bills pursuant to the terms of this Special Program. This $15,000 that I am eligible to receive from the Trust is full and final settlement under the Special Program. I am fully aware that the payments I receive under the Special Program will be deducted from any amounts that I later may be entitled to receive from the Trust.

from any amount ultimately awarded to Ms. Crombie.[2] The relevant portion of Ms. Crombie's examination on this issue is as follows:

Q. Now, at some point in time after you made your claim to the Dalkon Shield Claimants Trust you asked to participate in a program called an in vitro payment program and asked that you be given certain money to pay for your in vitro efforts; is that correct?

A. Yes, yes.

Q. And those payments came to a total of $15,000, did they not?

A. Yes.

. . .

MR. MACKEY: We'll stipulate that the Dalkon Shield Claimants Trust has a $15,000 credit if that'll speed things up here.

ARBITRATOR: *Do you want something more than that?*

MR. TUCKER: That's fine.

ARBITRATOR: So then—

MR. MACKEY: *So that number minus $15,000.*

ARBITRATOR: *Is your write-down.*

MR. MACKEY: Yes. At least for the special damages.

MR. TUCKER: Nothing further, your Honor.

ARBITRATOR: Okay.

Mot. Ex. F at 6, 10 (emphasis added).

On May 13, 1997, Arbitrator Smith issued his decision awarding Ms. Crombie $492,-479.03. After finding it "more likely than not that Ms. Crombie did have Pelvic Inflammatory Disease ("PID") in June of 1979, which was caused by her use of the Dalkon Shield," Arbitrator Smith also found that "[n]either the Dalkon Shield nor the PID from which Ms. Crombie suffered in 1979, made her permanently infertile." Mot. Ex. C at 2. Rather, Arbitrator Smith concluded that Ms. Crombie did not become infertile "until she underwent additional surgeries after 1981— surgeries required by her contracting PID

from her use of the Dalkon Shield IUD." *Id.* The arbitrator then stated,

given the fact that the Dalkon Shield Claimants Trust [ ] made payment to Mrs. Crombie under its Dalkon Shield In–Vitro Program, *the checks* which were introduced in this Arbitration as the Trust's Exhibit B without further explanation, *will be taken as a very telling admission against the Trust's interest by both conduct and perhaps even judicial admission.* While it may appear to the arbitrator that Mrs. Crombie's failed efforts to conceive after the miscarriage in 1981, were proximately caused by the surgeries necessitated the PID she had suffered in 1979 and hence her use of the IUD, the Trust apparently believed so also and admitted that belief by the payments represented by Exhibit B.

*Id.* (emphasis added). Arbitrator also dropped the following footnote.

Had Mrs. Crombie not been reimbursed in part for her efforts at IVF, or had the Trust offered some explanation of the payments contained in Trust's Exhibit B, my opinion perhaps would be different, purely on the bias [sic] of whether Mrs. Crombie had met her burden of proof. Once, however, the Trust made this admission, it is very difficult, if not impossible, for the arbitrator to find that any efforts which were undertaken by Mrs. Crombie to become pregnant, were not caused by her use of her second Dalkon Shield IUD, including surgeries which caused more adhesions and her eventual permanent infertility.

*Id.* at 3 (emphasis added). Finally, Arbitrator Smith stated:

The Trust itself introduced evidence of payments made in connection with Mrs. Crombie's participation in the Dalkon Shield In–Vitro Fertilization Program. The only conclusion which can be drawn from these payments, in this case is that In–Vitro Fertilization was necessary. *The Trust itself apparently viewed Mrs. Crombie's participation in the In–Vitro Program as a necessary and foreseeable result*

---

2. Except as needed to make the required offset, the fact of payment pursuant to the Special Program was not admissible in any subsequent proceeding on the claim.

*of her use of the Dalkon Shield IUD and so admits causation here.*

*Id.* at 7 (emphasis added). Based on the foregoing statements regarding the Trust's IVF reimbursement payments to Ms. Crombie, the Trust now argues that Arbitrator Smith exceeded his powers and usurped this Court's exclusive jurisdiction to interpret whether payments made pursuant to Section K of the CRF constitute an admission of causation. Accordingly, the Trust asks the Court to vacate Arbitrator Smith's decision and order a new arbitration hearing before a different arbitrator.

## II.

█ In order to vacate an arbitrator's decision on a Dalkon Shield claim, the Court must find at least one of the four grounds identified in Rule 44(a) of the Arbitration Rules:

1. The award was procured by corruption, fraud or undue means.

2. The arbitrator was biased or corrupt.

3. The arbitrator was guilty of abuse of discretion in refusing to postpone the hearing, refusing to admit competent and relevant evidence, or engaging in misconduct that prejudiced the moving party.

4. The arbitrator exceeded his or her powers, or so exercised them such that he or she failed to make a final, definite, and unambiguous award.

Arbitration Rule 44(a).[3] Throughout these bankruptcy proceedings, this Court has emphasized that a Dalkon Shield arbitrator's decision will receive substantial deference on review. *E.g. In re A.H. Robins Co. (Germany v. Dalkon Shield Claimants Trust),* 197 B.R. 525, 527 (E.D.Va.1995). This is because an overly expansive review of arbitration decisions would undermine the efficiencies which arbitration seeks to achieve. *Id.* at 528 n. 2. Recently, in *In re A.H. Robins Co. (MacLeod v. Dalkon Shield Claimants Trust),* 213 B.R. 468 (E.D.Va.1997), this Court reiterated the standard under which it reviews the decision of an arbitrator. The Court stated:

An arbitrator's decision receives substantial deference on review, and may only be vacated for the grounds stated in the Arbitration Rules, § 10 of the Federal Arbitration Act, or where the arbitrator acted in manifest disregard of the law. This Court will not overturn an arbitration decision merely because the Court would have reached a different conclusion if presented with the same facts. Instead, the Court's role is limited to determining whether the arbitration process was itself flawed.

*Id.* at 470 (citing *Germany,* 197 B.R. at 527–28, and *In re A.H. Robins Co. (O'Connor v. Dalkon Shield Claimants Trust),* 158 B.R. 640 (E.D.Va.1993)).

## III.

The Trust brings the present action pursuant to subsection 4 of Rule 44(a) of the Arbitration Rules. The Trust contends that Arbitrator Smith exceeded his powers by impermissibly interpreting the Plan and CRF to find that the Trust's IVF reimbursement checks to Ms. Crombie constituted an admission of causation. Ms. Crombie argues, however, that Arbitrator Smith set forth a rational basis for his causation finding apart from any interpretation of the IVF reimbursement payments and thus, "[t]he propriety of finding an admission is [ ] not significant to the validity of the arbitration decision." Resp. at 15. The Court disagrees.

A. *This Court Retains Exclusive Jurisdiction to Interpret The Plan, CRF, and Related Documents.*

█ As a general rule, arbitrators do not have the authority to interpret the A.H. Robins' Plan of Reorganization or its related documents; that power is reserved exclusively for this Court. *See In re A.H. Robins Co. (Dalkon Shield Claimants Trust v. Reiser),* 972 F.2d 77 (4th Cir.1992). An arbitrator usurps this exclusive interpretative authority if he or she "ascrib[es] any meaning to the Plan, CRF, or related instruments that is *neither plain on the face of the words nor*

---

**3.** Pursuant to Arbitration Rule 44(d), these grounds are to be interpreted consistently with the identical provisions of § 10 of the Federal Arbitration Act, 9 U.S.C. § 10.

*pronounced by this Court."* In re A.H. Robins Co. (Besag v. Dalkon Shield Claimants Trust), 197 B.R. 590, 595 (E.D.Va.1994) (emphasis added). An arbitrator does not, however, intrude on this Court's jurisdiction by "reading, understanding, applying, or assessing the local effect of the plain, ordinary meaning of language." *Id.*

**B.** *Arbitrator Smith Exceeded His Authority in Interpreting The Plan, CRF, and Related Documents*

**1.** *The Scope of Arbitrator Smith's Authority*

In *In re A.H. Robins Co. (Germany v. Dalkon Shield Claimants Trust)*, 197 B.R. 525 (E.D.Va.1995), this Court established the scope of an arbitrator's authority as being "contractually defined by the agreement pursuant to which the parties submit their dispute to arbitration." *Id.* at 528. In Ms. Crombie's case, the parties signed an Arbitration Election and Agreement form which provided that the arbitration hearing "shall be conducted as provided in the First Amended Rules Governing Arbitration." Mot. Ex. A. The parties also agreed that their Arbitration Agreement "shall be interpreted in accordance with the Sixth Amended and Restated Plan of Reorganization" and that "[t]he United States District Court for the Eastern District of Virginia [ ] is the only court with jurisdiction to interpret and enforce the Plan, the documents incorporated in it, Amended Administrative Order No. 1 and this Agreement." *Id.*

■ Encompassed within the Plan, the Arbitration Rules, and the parties' agreement is the well-established principle that it is properly within the arbitrator's authority to address the issue of causation. *See Germany,* 197 B.R. at 528. Thus, Arbitrator Smith clearly had jurisdiction to decide whether the Dalkon Shield caused Ms. Crombie's PID and subsequent infertility. As discussed below, Arbitrator Smith did not, however, have jurisdiction to interpret the Plan and CRF by finding that the Trust's IVF reimburse-

ment payments to Ms. Crombie constituted an admission of causation. Nothing in the plain language of the Plan, CRF, or any pronouncement of this Court states that payments made to a claimant pursuant to Section K of the CRF are an admission of causation. Arbitrator Smith's reliance on these payments as a basis for finding causation was therefore improper and beyond the scope of his powers.

**2.** *The Burden of Proving Causation*

■ Arbitration Rule 35(a) clearly states that a Dalkon Shield claimant bears the burden of proving by a preponderance of the evidence that she used the Dalkon Shield IUD, was injured, and that the Dalkon Shield "was the cause in fact and the proximate cause of her injury." Absent waiver by the Trust,[4] whether the Dalkon Shield caused the injury for which a claimant seeks damages is therefore a crucial element of every claimant's case in arbitration. *See In re A.H. Robins Co. (Dalkon Shield Claimants Trust v. Finkel),* 197 B.R. 513, 516 (E.D.Va.1994).

In the instant case, Ms. Crombie argues that Arbitrator Smith independently found that she had sustained her burden of proving that her PID and infertility were each caused by the Dalkon Shield. In support of her position, Ms. Crombie cites to Arbitrator Smith's Conclusions of Law—the relevant portion of which follows:

> Pamela Crombie suffered pelvic inflammatory disease in June of 1979 that was caused by the Dalkon Shield. The preponderance of the evidence shows that she displayed the classic symptoms of PID and that the diagnosis was confirmed by Dr. Donald's and Dr. Mills' operative findings in 1980. The pelvic inflammatory disease caused infertility problems and resulting medical and surgical care that were part of a natural and continuous sequence connected to the primary fault, self-operating, which caused the injury—use of the Dalkon Shield.

Mot. Ex. C. at 7.

■ Read in context, however, the Court finds that that excerpt, much like the

---

**4.** Section G.13 of the CRF provides that "[c]ausation will be an issue except as waived by the Trust."

remainder of the decision, is infected by Arbitrator Smith's finding that the IVF reimbursement payments constitute an admission of causation. Arbitrator Smith repeatedly makes reference to those payments as a basis for his conclusion that the Dalkon Shield caused Ms. Crombie's infertility, making it abundantly clear that he accorded substantial weight to their significance. In fact, in what Ms. Crombie describes as a "mere" footnote, Arbitrator Smith admits as much:

> Had Mrs. Crombie not been reimbursed in part for her efforts at IVF, or had the Trust offered some explanation of the payments contained in Trust's Exhibit B, *my opinion perhaps would be different, purely on the bias [sic] of whether Mrs. Crombie had met her burden of proof.*

Mot. Ex. C at 3 n. 1. This statement clearly indicates that Arbitrator Smith relied upon the IVF reimbursement payments to such an extent that he effectively relieved Ms. Crombie of her burden of proving causation. This is an impermissible interpretation of the Plan and CRF, irrespective of whether Arbitrator Smith mentioned those specific documents in his conclusion.[5]

It is well-settled that settlement offers or completed settlements are not relevant to and cannot be used as evidence on the question of whether the Dalkon Shield caused the claimed injuries. *See In re A.H. Robins Co.* *(Tower v. Dalkon Shield Claimants Trust)*, 197 B.R. 516, 518 (E.D.Va.1994) (holding that the Trust's settlement offer is not "relevant to the question of causation" and that the Trust's position on settlement does not affect the analysis of whether the Dalkon Shield caused the claimant's injuries).[6] Given the language of the Section K directive, the Release Agreement, and the Special Program Payment Request Form, the Court finds that IVF reimbursement payments are akin to an advancement of a claimant's potential settlement offer and as such, cannot be used to bypass the claimant's burden of proving causation by a preponderance of the evidence.

Should the Court find otherwise, the Trust would be deemed to admit causation in all cases in which a claimant has qualified for the Special Program and received reimbursement for IVF procedures—including those cases in which the claimant was ultimately found not to have suffered injuries caused by the Dalkon Shield. This would be an illogical and unjust result.

### IV.

Having demonstrated that Arbitrator Smith impermissibly interpreted the Plan and CRF, the Trust has satisfied its burden of establishing that Arbitrator Smith exceeded his powers.[7] Arbitrator Smith's finding

---

**5.** Ms. Crombie asserts that no interpretation of the Plan occurred because Arbitrator Smith never mentioned a Plan or CRF provision in his eight page arbitration decision. The Court disagrees. Rarely, if ever, will an arbitrator expressly construe a Plan provision inasmuch as Arbitration Rule 32(f)(7) makes the Plan inadmissible in arbitration proceedings. Moreover, Ms. Crombie fails to recognize that interpretation can be latent as well as patent. When Arbitrator Smith concluded that the Trust admitted causation by making IVF payments to her, he tacitly ascribed meaning to Section K of the CRF which did not otherwise exist, was not plain on the face of the words, and which this Court had not pronounced previously. As such, his latent interpretation of the Plan was as much an usurpation of this Court's jurisdiction as if he had explicitly mentioned the Plan provision in his decision.

**6.** Consistent with this Court's holding in *Tower*, Arbitration Rule 32(g), which Arbitrator Smith was bound to follow, provides that "[t]he decision and offer of the Trust ... constitute a settlement offer and shall not be deemed or considered as evidence of, or an admission of, causation or liability."

**7.** Ms. Crombie urges this Court to deny relief to the Trust, even if Arbitrator Smith did exceed his powers, contending that the Trust invited Arbitrator Smith to err by needlessly introducing evidence of the IVF reimbursements at the arbitration hearing. The Court is not persuaded by this argument. The Court's May 21, 1997 Order approving the emergency fund program and which is the precursor to the Section K Emergency Fund, specifically allows the admission of IVF payments for the sole purpose of effecting the required offset. Moreover, based on the colloquy among the parties and Arbitrator Smith, it was apparent to Ms. Crombie (and should have been to Arbitrator Smith) that the sole purpose for introduction of the evidence was to effect the offset in the event Arbitrator Smith awarded Ms. Crombie compensation. *See* Mot. Ex. F at 10. The Trust simply could not have anticipated that, in the face of a stipulation as to the documents' purpose, Arbitrator Smith would use them nevertheless as an admission of causation.

that the IVF reimbursement checks constitute an admission of causation is "a legal nullity, not binding on any person for any purpose." *In re A.H. Robins Co. (Dalkon Shield Claimants Trust v. Honore)*, 197 B.R. 530, 533 (E.D.Va.1994). Accordingly, the Court will vacate Arbitrator Smith's decision and order that a new arbitration hearing be conducted before a different arbitrator.

An appropriate Order shall issue.

### ORDER

This matter is before the Court on the Dalkon Shield Claimant Trust's Motion To Vacate Arbitration Decision. Upon due consideration, for the reasons stated from the bench and in the Memorandum this day filed, and deeming it just and proper to do so, it is ADJUDGED and ORDERED that the Motion be, and the same is, hereby GRANTED.

It is FURTHER ORDERED that a new arbitration hearing be conducted before a different arbitrator in accordance with this Court's Order entered on April 23, 1998.

Let the Clerk send a copy of this Order and the accompanying Memorandum to counsel for the Dalkon Shield Claimants Trust, Melody G. Foster, Post Office Box 1314, Richmond, Virginia 23210; and to counsel for Pamela Crombie, Montgomery W. Mackey, 35 E. Wacker Drive, Suite 3101, Chicago, Illinois 60601.

Likewise, the Trust is not barred from relief based on Ms. Crombie's argument that the Trust violated Arbitration Rule 17 by not exchanging the IVF reimbursement checks before the arbitration hearing. Those checks were used during cross-examination, and Arbitration Rule 17 does not require pre-hearing identification of documents used in that context. Regardless, any complaints about the Trust's admission of the IVF reimbursement checks were waived by Ms. Crombie's failure to object to their admission under the Arbitration Rules and the Federal Rules of Evidence, which are incorporated in the Arbitration Rules by reference.